997 A.2d 257 (2010)
413 N.J. Super. 580
In the Matter of JOHNNY POPPER, INC. t/a J.D. Byrider t/a Fisher's Fine Automobiles.
DOCKET NO. A-4398-08T1.
Superior Court of New Jersey, Appellate Division.
Submitted March 15, 2010.
Decided June 9, 2010.
*258 Giansante & Cobb, LLC, attorneys for appellant Johnny Popper, Inc. (Carol Rogers Cobb, of counsel and on the briefs).
Paula T. Dow, Attorney General, attorney for respondent New Jersey Division of Consumer Affairs (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Nicholas Kant, Deputy Attorney General, on the brief).
Before Judges LISA, BAXTER and ALVAREZ.
The opinion of the court was delivered by
LISA, P.J.A.D.
Appellant is a used car dealer in Clementon. It was cited by the Division of Consumer Affairs (Division) for violating a provision in the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -195, which provides:
It shall be an unlawful practice for any person to sell, attempt to sell or offer for sale any merchandise at retail unless the total selling price of such merchandise is plainly marked by a stamp, tag, label or sign either affixed to the merchandise or located at the point where the merchandise is offered for sale.
[N.J.S.A. 56:8-2.5.]
On the day for which appellant was cited, it had thirty-four used vehicles on its lot. An inventory stock number was posted on each vehicle. However, none of the vehicles had the sale price affixed, nor was there any posting of the vehicle prices anywhere on the lot. Appellant maintained a price list inside its building, which is a converted house. The price list consisted of two letter-size pages, listing each vehicle on the lot, its stock number, and its sale price.
Appellant's principal, Henry Marter, contended the price list was kept on a clipboard which was hung on a wall inside the building, accessible to anyone who entered the sales area. The Division's investigators denied this. They said the price list was not evident when they entered the building, and that Marter did not point it out to them hanging on a wall but retrieved it from the portion of the sales area where the desks were located.
Appellant conceded that sale prices were not affixed to the vehicles, but contended it satisfied the alternative requirement of N.J.S.A. 56:8-2.5 because the price list was in the sales office, which is the "point where the merchandise is offered for sale."
After a hearing over which he presided, the Director of the Division (Director) rejected appellant's contention. He reasoned that the legislative purpose of the CFA dictates that consumers should have independent access to the sale price of merchandise, without the need to encounter a sales person. He therefore concluded that the point where an item is "offered for sale" is the place where the item is located, not where the sale transaction occurs. As a result, he held that if the sale price is not affixed to each vehicle, the alternative provision of the statute requires the price "to be posted at least proximate to where a vehicle is located," and that appellant's practice of maintaining a price list inside the building was "insufficient." The Director credited the investigators' testimony and found that the price list was not hung on the wall and independently accessible to customers. He nevertheless deemed this factual finding inconsequential, concluding that maintaining the price list inside the building *259 violated the statute "whether or not it was hung on the interior wall."
For the CFA violation, appellant was assessed a $1700 civil penalty, see N.J.S.A. 56:8-13, costs of $1484, see N.J.S.A. 56:8-11, and attorney's fees of $2241, see N.J.S.A. 56:8-19; it was also ordered to cease and desist from engaging in the conduct found to be unlawful, see N.J.S.A. 56:8-18. The Division stayed payment of the monetary assessments pending appeal.
Appellant argues that the Division's interpretation of the alternative provision of N.J.S.A. 56:8-2.5 was erroneous, and that its practice of maintaining a price list inside its building satisfies the provision. We disagree with appellant and affirm.
The judicial role in interpreting a statute is to ascribe a meaning that will "effectuate the legislative intent in light of the language used and the objects sought to be achieved." State v. Hoffman, 149 N.J. 564, 578, 695 A.2d 236 (1997). The starting point is to examine the language of the statute. State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982). "If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." Ibid. If the statute is not clear or is susceptible to more than one possible meaning or interpretation, courts look to other sources, such as legislative history, as a guide to determining the Legislature's intent. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553-54, 964 A.2d 741 (2009). The judicial "task is often assisted by interpreting a statute consistently with the overall statutory scheme in which it is found." Id. at 554, 964 A.2d 741 (citing Merin v. Maglaki, 126 N.J. 430, 436, 599 A.2d 1256 (1992)).
Relying on dictionary definitions of "offer," the Division argues that the place at which something is "offered for sale" can only mean the place where the consumer finds it. Appellant argues that the term plainly denotes the place where the sale transaction occurs, namely in the sales office inside the building, for it is there that the sale is discussed and consummated. Although the meaning urged by the Director is the more plausible one, we cannot say it is so clear as to be the only possible interpretation. The meaning appellant suggests is also possible. Therefore, because of the ambiguity we must look beyond the statutory language to ascertain what the Legislature intended.
A core purpose of the CFA is to protect consumers from sharp practices and dealings in the marketing of merchandise. Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 263, 696 A.2d 546 (1997). The CFA should be liberally construed to accomplish its remedial purpose of rooting out consumer fraud. Id. at 264, 696, A.2d 546. This remedial legislation should be construed in favor of consumers if such a construction is reasonable. See Cox v. Sears Roebuck & Co., 138 N.J. 2, 15, 647 A.2d 454 (1994). "[T]he Legislature passed the [CFA] `to permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer.'" Id. at 14, 647 A.2d 454 (quoting Senate Committee, Statement to Senate Bill No. 199 (1960)). The Attorney General enforces the CFA through the Division. Lemelledo, supra, 150 N.J. at 264, 696 A.2d 546.
Against the backdrop of these broad principles we consider the specific CFA provision at issue here. N.J.S.A. 56:8-2.5 was added to the CFA in 1973. L. 1973, c. 308, § 1. Its legislative history includes this pronouncement, which illuminates the issue before us: "Consumers have a right to know the price of all items they wish to purchase before taking them off the *260 shelves. Clear indication of the price of all merchandise will aid in preventing discriminatory sales practices and capricious pricing by merchants." Sponsor's Statement, Statement to Assembly Bill No. 1172 (May 11, 1972).[1]
This statement evinces a clear intent that consumers should be able to know the price of an item as they look at it and without having to inquire or interact with a salesperson. By mandating that independent and certain pricing information be provided to the consumer as he or she views the merchandise, the consumer is empowered in deciding whether to buy. The consumer can compare the item to other similar products in the same store or in other stores. Most importantly, this requirement prevents merchants from engaging in sharp practices, capricious price quotes, or pressure tactics, depending upon such circumstances as how badly the consumer seems to want or need the item or how much he or she appears to be willing or able to pay. We agree with the Director's observation that independent access to the selling price "undercuts the capacity of sellers to mislead as to price, or to require the consumer to endure sales pressure as a prerequisite to disclosure of the selling price, a core element of any consumer transaction."
Not all merchandise is offered for sale on shelves, but the CFA's broad remedial purpose applies to all merchandise offered for sale at retail. Indeed, the practices Marter described at the hearing in this case illustrate the evil this provision was designed to eliminate. Marter explained that his customers are typically low income, high credit risk individuals, who are looking for basic transportation and are more interested in whether they will be able to get the necessary loan and the amount of the monthly payment than they are in the actual price. He gave this testimony:
Q. Consumers come to your business and they look around at the cars on the lot, correct?
A. Yes.
Q. And then your salespeople approach the consumers and speak with them?
A. Yes.
Q. Outside in the lot, right?
A. Yes.
Q. And if the consumer asks for a price, the salesperson will tell them the price, right?
A. Wrong.
Q. No?
A. No.
Q. What happens when a consumer asks for the price?
A. We go right up to the consumer and say how are you, do you know anything about how we do business, how we recondition the cars or the financing that we offer? They say no for the most part because they don't. We say come on inside, we'll sit down and explain to you everything we do and that's what we do and if they don't follow in, they go back in their car and leave and that's how the salespeople are instructed. There is just too much to go over, too much to do to be babbling in the lot.
Q. So a consumer who is outside looking at cars wants to know the price *261 of a car, your salespeople don't tell them the price outside?
A. We don't discuss anything until we sit down at the desk to do business.
Q. So your salespeople as far as you know never tell consumers the price outside?
A. I would just about stake my life on it because they would lose their job. We have a way that we run the program.
Although Marter asserted that if a customer persists in learning the sale price before getting a sales pitch the price will be provided, he also gave this testimony:
Q. So once the consumer asks for the price, you take them inside, then the salesperson tells them the price?
A. No.
Q. No?
A. No.
Q. What happens?
A. First thing we do we sit down and tell them how we do things, which if the tires are on the used car are 50 percent or more it gets tires, the battery two years or more, it gets a battery, explained the warranty and so on and so forth and then if they are interested, we do a budget to make sure they can afford it because if they can't afford it, it's going to be a recall and that's not fair.
Q. What does the budget consist of?
A. What their income is and what their out go is.
Q. They are telling you their income and other information before they know what the price of the vehicle is?
A. They are not particularly interested in the price of the vehicle, they want to know if they are going to get the loan and what vehicle will be.
....
Q. I believe you find out all this information like income before they ever find out what the price is?
A. Unless they ask for the price.
[Director]: Mr. Marter, yes or no.
THE WITNESS: Yes.
There is nothing in the record to suggest that appellant ever quoted customers prices other than those listed on a pre-printed price list in its building. However, the capacity for fraudulent conduct is obvious. The "price" could be tailored to the customer's financial ability. The dealer might not display a price list at all. The dealer could have more than one price list to show the customer, choosing the one most advantageous to the dealer after obtaining the customer's financial information and sizing up the strength of his or her interest in making the purchase.
The Director concluded that "[t]he legislative purpose of N.J.S.A. 56:8-2.5 is precisely to prevent the type of sales program described by [appellant] in which the selling price is withheld on the theory that the consumer is best guided by the seller, and wants only to learn the amount of the installment payments." He found it "apparent... that by enacting N.J.S.A. 56:8-2.5, the [L]egislature has rejected that paternalistic point of view in favor of empowering consumers." We agree.
The provision of independent and certain price information to the consumer as he or she views the corresponding merchandise, i.e. the various vehicles on the lot, without the necessity for interaction with a salesperson, would preclude the merchant's ability to engage in sharp practices regarding price such as those we have described. It would also facilitate the desirable practice of comparison shopping by consumers without the need to interact with salespersons if the consumer so wishes.
*262 This analysis supports the construction that if the sale price is not affixed to the vehicle, the alternative allowable place where it must be posted is in close proximity to where the customer finds the vehicle such that the customer can independently know the price while looking at the vehicle. The structure of N.J.S.A. 56:8-2.5 further supports this construction. The statute provides two options. One is that the price be affixed to the merchandise. Because the purpose of this section is the same regardless of which option a merchant chooses, it stands to reason that the other option should serve the same purpose and be similar in its command. "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section to produce a harmonious whole." Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 46:5 at 189-90 (7th ed. 2007) (citing State v. Sutton, 132 N.J. 471, 479, 625 A.2d 1132 (1993) ("Ultimately, we seek an interpretation that will make the most consistent whole of the statute.") (internal quotation marks omitted)). Thus, for example, with numerous small items placed on a shelf, a merchant may tag each one with the price or may post the price on the shelf at that location. Either option fulfills the purpose of the statute.
We are also guided by the canon of construction that statutes should be interpreted in a manner that avoids unreasonable or absurd results. Strasenburgh v. Straubmuller, 146 N.J. 527, 541, 683 A.2d 818 (1996) ("It is a venerable principle that a law will not be interpreted to produce absurd results."). The interpretation urged by appellant would lead to an untenable result. It would allow, for example, a supermarket to place no prices on or near the thousands of items on its shelves in lieu of a comprehensive price list kept at the register, which would be deemed the location at which the merchandise is offered for sale. Rather than advancing the purpose of N.J.S.A. 56:8-2.5, such a practice would defeat it.
Finally, we recognize the expertise of the Division, which is charged with the responsibility of enforcing the CFA, see Barry v. Arrow Pontiac, Inc., 193 N.J.Super. 613, 619, 475 A.2d 632 (App.Div.1984), a function it has been performing for several decades. Although courts are not bound by an agency's interpretation of a statute, Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973), substantial judicial deference is accorded to the interpretation of an agency charged with enforcing a statute unless that interpretation is plainly unreasonable. In re N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 351, 696 A.2d 585 (1997). The Division's interpretation in this case is clearly a reasonable one, and our deference to it comports with and reinforces the interpretation we have independently made.
Affirmed.
NOTES
[1] As originally introduced, the bill required that the price be affixed to the merchandise or located at the point "of display." It was amended during the legislative process to delete "of display" and insert in its place "where the merchandise is offered for sale." L. 1973, c. 308, § 1. This aspect of the legislative history does not affect our analysis. Unlike in this case, not all merchandise that is offered for sale is displayed.